*Sebastian Albert Campbell v. State of Maryland*, No. 156, Sept. Term, 2018. Opinion filed on December 18, 2019, by Berger, J.

CRIMINAL LAW – TRIAL – COURSE AND CONDUCT OF TRIAL IN GENERAL – COURTROOM SECURITY

Trial court did not abuse its discretion or violate appellant's constitutional rights when, during certain portions of trial, the court permitted courtroom security personnel to be positioned near appellant, who, in addition to representing himself, was in custody. The trial court duly recognized that appellant, as his own attorney, may need to move around the courtroom during trial but that, as a prisoner, he was subject to certain protocols that the sheriff's deputies generally followed in those situations. In addition, the trial court made assurances that the deputies would not be "disruptive;" that they would act in the "least invasive way;" that they would "quietly move behind [appellant];" and that there would be "no reference whatsoever to the fact that [appellant] was in custody."

CONSTITUTIONAL LAW – DUE PROCESS – CRIMINAL LAW – DISADVANTAGED PERSONS – INDIGENCY – EXPERT ASSISTANCE

Trial court did not violate appellant's constitutional rights in ruling that he was not entitled to funding from the Office of the Public Defender ("O.P.D.") to pay for an expert witness. Appellant could have obtained a state-funded expert witness had he accepted representation by O.P.D., but he chose to reject that service and represent himself.

CRIMINAL LAW – REVIEW – PRESENTATION AND RESERVATION IN LOWER COURT OF GROUNDS OF REVIEW

Appellant's claim that the trial court erred in its handling of his request to have evidence shown to the jury was either unpreserved or affirmatively waived because appellant failed to lodge an appropriate and timely objection to the court's actions.

CRIMINAL LAW – EVIDENCE – HEARSAY/FACTS IN ISSUE AND RELEVANCE

Trial court did not err in excluding the victim's out-of-court statement that her step-father had abused her. The statement was not admissible as a prior inconsistent statement under the hearsay exception outlined in Maryland Rule 5-802.1(a)(2) because the statement was not inconsistent with the victim's trial testimony. The statement was also irrelevant.

CRIMINAL LAW – TRIAL – JURY INSTRUCTIONS

Trial court did not commit plain error in instructing the jury that evidence included "testimony from the witness stand" where appellant had given part of his testimony from the trial table. Not only was the given instruction identical to the Maryland pattern jury instruction, but appellant affirmatively waived his objection to the instruction when, during the parties' discussion of proposed jury instructions, he expressly stated that he had no objection to the court giving the pattern instruction as written.

Circuit Court for Montgomery County
Case No. 131730

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 156

September Term, 2018

_____

SEBASTIAN ALBERT CAMPBELL

v.

STATE OF MARYLAND

_____

Berger,
Leahy,
Shaw Geter,

JJ.

_____

Opinion by Berger, J.

_____

Filed: December 18, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A jury, in the Circuit Court for Montgomery County, convicted Sebastian Campbell, appellant, of two counts of sex abuse of a minor and four counts of second-degree rape. The Court sentenced appellant to a total term of 130 years' imprisonment. In this appeal, appellant presents several questions for our review, which we have rephrased and renumbered for clarity. They are as follows:

1. Whether the trial court abused its discretion in permitting courtroom security personnel to be positioned near appellant during certain portions of his trial.

2. Whether the trial court violated appellant's constitutional rights in ruling that appellant, who was representing himself at trial, was not entitled to funding from the Office of the Public Defender to pay for an expert witness.

3. With respect to two recorded statements made by the victim, whether the trial court erred in requiring appellant to prove the admissibility of the two recordings before agreeing to provide him with audio/visual equipment to play the recordings for the jury; in refusing to allow him to play one of the recordings in its entirety for the jury; and in giving the jury the option of reviewing the other recording during deliberations rather than publishing that recording during the evidentiary portion of trial.

4. Whether the trial court erred in restricting appellant's cross-examination of the victim regarding a letter the victim had written in which she claimed that another individual had molested her.

5. Whether the trial court erred in restricting appellant's cross-examination of the victim regarding the victim's past sexual conduct.

6. Whether the trial court erred in instructing the jury that evidence included "testimony from the witness stand"

where appellant had testified from the lawyer's table and not the witness stand.

For reasons to follow, we hold that several of the issues raised by appellant were not preserved for our review. As to the issues that were preserved, we hold that the trial court did not err. Accordingly, we affirm the judgments of the circuit court.

## BACKGROUND

Appellant was arrested and charged after it was alleged that he had sexually abused his daughter (the "victim"). At trial, the victim testified that, in February of 2012, when she was 11-years-old and living with her mother in Michigan, she came to Maryland to live with appellant at his Rockville apartment. Approximately one month later, while the victim was asleep on the couch at his apartment, appellant pulled the victim's pants down and had vaginal intercourse with her against her will. In the months that followed, appellant engaged in non-consensual sexual intercourse with the victim "at least twice a week." At some point, the victim became pregnant with appellant's child, and, in August of 2013, the victim gave birth. Additional facts will be supplied below.

## DISCUSSION

## I.

Appellant's first claim of error concerns the trial court's handling of courtroom security. At the start of trial, but prior to jury selection, the court discussed several procedural matters with the State and appellant, who at the time was representing himself. During that discussion, the court addressed appellant regarding courtroom security:

> THE COURT: The next issue Mr. Campbell that I want to take up now so that we are all clear how that's going to be handled

2

is you are in custody so each time you come up to the bench, and we're in this Courtroom to pick the jury, we're going to be going back to my Courtroom for the trial but each time you come up to the bench, there is going to be a deputy standing behind you so I want you to know that. They will take great effort to make sure that it's not in any disruptive fashion but that is sheriff's protocol and they're going to follow [their] protocol. When it comes to the time of the trial, as you know, there will be witnesses or a witness will be called one at a time by the State as the moving party, the witness will be in the witness stand and they will have the ability to ask questions, show exhibits and conduct themselves in that fashion and will be moving around the Courtroom. You have two options Mr. Campbell with regard to your positioning is the term I'm going to use during any examination of a witness, whether it's in cross examination or if you choose to call any witnesses of your own. You can number one, you can stay seated and then the deputies will stay seated, that's option one. Option two is you can approach a witness if you would like with the knowledge and understanding that there will be a deputy next to you at all times. Again in the same least [] invasive way they have but that is a security issue, so it's one or the other. So which way would you prefer to handle –

[APPELLANT]: Oh, I don't mind the deputies, they can –

THE COURT: Okay, so I want to be sure we're clear. You would like to get up and approach the witness if need be. You'd stay seated otherwise but if the need arises to get up, you would approach the witness stand with the full understanding that a deputy will be standing next to you.

[APPELLANT]: All right.

Following that exchange, the court took a five-minute recess. When the parties returned to court, the following exchange occurred:

[APPELLANT]: How close are the deputies going to be to me? I don't understand. I mean, you didn't really give me a proximity.

3

THE COURT:  I don't have that proximity.  They're going to probably . . . be in the proximity you see them right now.  They're going to follow their protocol and they're going to –

[APPELLANT]:  I'm just concerned that it's, is that going to give the jury the impression that I'm in custody?  It's –

THE COURT:  Well, there's not going to be any reference whatsoever to the fact that you're in custody at all.  In fact, I'm glad you brought that up because there will be no reference by anybody that you are in custody, and each time we take a break the jury will be excused from the courtroom.  Before anybody takes one step towards moving anywhere, that will be at my direction and my direction only.  Is everybody clear on that?

[STATE]:  Thank you, Your Honor.

THE COURT:  And so, are you clear on that?

[APPELLANT]:  Yes.

THE COURT:  Okay.  So, what will happen is when you get up to move, they're going to quietly move behind you because that's their job.  So, I can't tell you is it going to be 10 inches, 18 inches.  They're going to be in enough distance that they follow their protocol for security, okay?

[APPELLANT]:  Because I –

THE COURT:  That's the best I can tell you.  That's why I'm telling you, you have two options, remain seated and they'll remain seated but if you feel the need to move around the courtroom, you'll do so with the deputy at a distance that allows them to maintain courtroom security and for you to do what you need to do approaching the witness stand.

[APPELLANT]:  All right.  I –

THE COURT:  And that's the best I can tell you.

[APPELLANT]:  I understand that.  So, I'm just going to object because –

4

THE COURT: Okay, you –

[APPELLANT]: – I have –

THE COURT: – can object. I just need to know which way you want to proceed.

[APPELLANT]: Well, either way, at this point is restriction on my ability to effectively defend my case, I feel, and I would object to the ultimatum itself. I have been in the courtroom before and represented myself from custody and did not have a guard following my footsteps in this very building. Maybe not this courtroom but definitely on this site in front of [another judge], so I understand that there is a certain security protocol but I will just object to anything that would tend to lead the jurors to believe that I am in custody or that I'm dangerous –

THE COURT: I think –

[APPELLANT]: – because if you've got a person following me around, the jury's going to look at me like I'm a dangerous person, and I –

THE COURT: I think you're going to find, Mr. Campbell, that the deputies are going to maintain a distance that, as I've said three times now, allows them to maintain courtroom security and safety and allows you to represent yourself. That's why . . . I've told you you have two options and if you wish to get up and feel the need to do that and pick up an exhibit or do whatever you need to do, and if you wanted to remain seated and you needed an exhibit, the clerk would make sure you had the exhibit to ask your question. If you would like to move around the courtroom, that's the way it's going to be and they will act as professionally as they always do to make certain that it is in a way that allows you to move about the courtroom while they maintain security. That's the best I can do to give you an answer, so your objection is noted. It's –
[APPELLANT]: Thank you.

THE COURT: – on the record. Thank you.

Appellant now argues that the trial court erred "by compelling him to present his defense in a four-day trial before the jury while conspicuously restrained by a tactical security team composed of at least three armed Montgomery County Sheriffs forming a close proximity mobile perimeter." Appellant maintains that this "spectacle unequivocally suggest[ed] to the jury that the justice system itself [saw] a need to separate [him] from the community at large." Appellant also maintains that the court erred by "completely relinquishing" its authority over courtroom security to the Montgomery County Sheriff's Office.

"The general rule, well settled in Maryland, is that 'the conduct of a criminal trial is committed to the sound discretion of the trial judge[.]'" *Wiggins v. State*, 315 Md. 232, 239 (1989) (citations omitted); *see also Choate v. State*, 214 Md. App. 118, 151 (2013) ("'The conduct of a criminal trial is committed to the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse.'") (quoting *Bruce v. State*, 351 Md. 387, 393 (1998)). "That control, however, must safeguard the defendant's constitutional rights." *Kelly v. State*, 392 Md. 511, 543 (2006). In other words, "[e]ven though the trial judge 'runs the court,' the right of an accused to a fair trial…is paramount." *Wiggins*, 315 Md. at 239 (citations and quotations omitted). "If the exercise of discretion results in the denial of a fair trial to a defendant, the discretion is certainly abused." *Id.* at 240.

In *Estelle v. Williams*, 425 U.S. 501 (1976), the United States Supreme Court held that a defendant's right to a fair trial is violated if he is "compelled to go to trial in prison or jail clothing." *Id.* at 504-506; *accord Knott v. State*, 349 Md. 277, 284, 292-93 (1998)

6

(holding that the defendant was prejudiced by being compelled to attend trial "while garbed in his orange, prison-issued jumpsuit."). In so holding, the Supreme Court noted that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment" and that such attire "is so likely to be a continuing influence throughout the trial that … an unacceptable risk is presented of impermissible factors coming into play." *Williams*, 425 U.S. at 504-05. The Supreme Court further noted that, although other similarly prejudicial measures may be permissible under certain circumstances, such as physically restraining a disruptive defendant, "compelling an accused to wear jail clothing furthers no essential state policy." *Id.* at 505.

In contrast, the Supreme Court, in *Holbrook v. Flynn*, 475 U.S. 560 (1986), held that the presence of four uniformed state troopers, who had been seen sitting behind the defendant in the first row of the spectators' section at trial, was not inherently prejudicial. *Id.* at 562, 568-69. In so doing, the Supreme Court distinguished the circumstances of that case from other practices, such as those presented in *Estelle v. Williams*, that it had deemed unconstitutional:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely

7

possible that jurors will not infer anything at all from the presence of the guards.

\* \* \*

To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions create the impression in the minds of the jury that the defendant is dangerous or untrustworthy. However, reason, principle, and common human experience counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial.

\* \* \*

We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial. But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section. Even had the jurors been aware that the deployment of troopers was not common practice in [that particular court], we cannot believe that the use of the four troopers tended to brand [the defendant] in their eyes with an unmistakable mark of guilt.

*Id.* at 569-571 (internal citations, quotations, and footnote omitted).

Similarly, in *Williams v. State*, 137 Md. App. 444 (2001), this Court held that the trial court did not err in refusing the defendant's request to have his Department of Corrections' identification bracelet removed during trial. *Id.* at 453. After discussing the facts and holdings of *Estelle v. Williams* and *Knott v. State, supra*, we noted that, "[a]lthough a person in an orange jumpsuit might stand out like a proverbial sore thumb, the same cannot be said when a person wears an institution's identification bracelet." *Id.* at 449-52. We explained:

8

> [W]e see no hint in the record that the bracelet worn by [the defendant] branded him as a prisoner. To the contrary, the trial judge stated that the jurors might think the bracelet was a "hospital band." … Moreover, there is no evidence in the record as to the size of the courtroom or the distance between the jurors and [the defendant], which might have shed light on the question of the visibility of the bracelet. Therefore, we cannot tell from the record whether the jurors could necessarily see the bracelet. Nor do we know whether [the defendant] wore the kind of clothing that would have helped to conceal the bracelet[.]

*Id.* at 452.

Against that backdrop, we hold that the trial court did not err in its handling of courtroom security during appellant's trial. That is, we cannot say that the court's placing of security personnel near appellant at various phases of his trial was so inherently prejudicial that appellant was denied his constitutional right to a fair trial. Unlike in *Estelle v. Williams*, where the defendant "appeared at trial in clothes that were distinctly marked as prison issue," *Williams*, 425 U.S. at 502, and *Knott v. State*, where the defendant "testified before the jury while garbed in his orange, prison-issued jumpsuit," *Knott*, 349 Md. at 284, there is nothing inherently prejudicial about the presence of one or more security guards near a defendant during trial. *See Brown v. State*, 132 Md. App. 250, 268 (2000) ("The mere presence of uniformed police officers [at trial] in itself does not appear to be 'inherently prejudicial[.]'"). Moreover, we can find nothing in the record to suggest that the presence of the sheriffs was in any way remarkable or even noticeable by the jury, much less an "unmistakable indication" that appellant was in jail or that he needed to be

9

separated from the community at large.[1]  To the contrary, the record shows that the court's use of security personnel was reasonable and not prejudicial to the Appellant.  *See Bruce*, 318 Md. at 721-22 ("Our inquiry is … whether the [security] measures utilized were reasonable and whether, given the need, such security posed an unacceptable risk of prejudice to the defendant.").

As the court explained when it first broached the subject at trial, the sheriffs would only follow appellant if he chose to approach the witness stand, which he did not have to, and that, if that happened, the sheriffs would stay at a distance that allowed them to maintain courtroom security while also permitting appellant "to do what [he] need[ed] to do approaching the witness stand."  The court also made clear that the deputies would not be "disruptive;" that they would act in the "least invasive way;" and that they would "quietly move behind [appellant]."  Finally, the court stated emphatically that there would be "no reference whatsoever to the fact that [appellant] was in custody."

Even if we assume that the jury could observe and actually took note of the fact that there were one or more security guards near appellant during trial, that circumstance is fairly routine and subject to a wider range of inferences than other inherently prejudicial indicators like shackles or prison garb.  *Compare to Wiggins v. State*, 315 Md. 232, 239-

---

[1] Appellant claims that he was "conspicuously restrained by a tactical security team composed of at least three armed [sheriffs] forming a close proximity mobile perimeter;" that the security measures were a "spectacular display of choreographed, close supervision where multiple armed sheriffs shadowed every one of appellant's movements, hands on their weapons, eyes transfixed;" and that the sheriffs "perpetually stalk[ed] appellant's every move in close proximity as he conduct[ed] his defense."  The record is completely devoid of any support for any of those assertions.

245 (1989) (holding that the trial court, in permitting guards to wear gloves for fear of contracting AIDS from the defendant, committed reversible error because the court did not have a sufficient basis to believe the defendant had AIDS and because the jurors could easily have inferred, given the "contemporary climate," that the defendant had AIDS and should "be withdrawn from public circulation and confined to an institution with others of his ilk."). Although the jury in the present case could have inferred that appellant was in jail based on the presence of the security guards, the jury could just as easily have inferred that the officers were there "to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." *Holbrook*, 475 U.S. at 569. Again, there is no evidence in the record that the jurors inferred *anything* from the positioning of security personnel at appellant's trial, much less any evidence to suggest that "what they saw was so inherently prejudicial as to pose an unacceptable threat to [appellant's] right to a fair trial[.]" *Bruce*, 318 Md. at 721 (citing *Holbrook*, 475 U.S. at 572).

We also reject appellant's claim that the trial court failed to exercise its discretion.[2] In implementing the security measures, the court recognized that appellant, as his own

---

[2] In setting forth his argument, appellant partly relies on a statement made by the trial judge at trial, in which the court intimated that it had "absolutely nothing to do with security protocol." Our review of the relevant portion of the transcript reveals that those comments were made the following day during a completely different discussion, in which appellant had asked the court how someone could, if they wanted to, get him "some clothes to change into." In response, the court stated that such arrangements were made by the prison and that the court had "nothing to do with [that] security protocol." Thus, appellant's reliance on the court's comment is inappropriate, as it was taken out of context and is not germane to the issue presented here.

11

attorney, may need to move around the courtroom during trial. The court also recognized that appellant was a prisoner and that there were certain protocols that the sheriffs generally followed in those situations. Based on those factors, the court made the discretionary decision to have security personnel stand near appellant when he approached the witness stand, only deferring to the security guards with respect to how close the guards would stand in relation to appellant. In so doing, the court made clear that the deputies would not be disruptive and that appellant would be permitted "to do what [he] need[ed] to do approaching the witness stand." Moreover, when appellant expressed his concerns that the placement of the security guards may give the jury the impression that he was in custody, the trial judge stated that "before anybody takes one step, that will be at my direction and my direction only."

Accordingly, from the record in this case, it is clear that the court properly analyzed the relevant facts and circumstances and then acted accordingly and within the bounds of its discretion. *See Maddox v. Stone*, 174 Md. App. 489, 502 (2007) (noting that we "will reverse a decision that is committed to the sound discretion of a trial judge if we are unable to discern from the record that there was an analysis of the relevant facts and circumstances that resulted in the exercise of discretion.") (emphasis removed). As a result, for all the reasons discussed herein, the trial court did not abuse its discretion in permitting courtroom security personnel to be positioned near appellant during certain portions of the trial.[3]

---

[3] In October of 2018, appellant filed in this Court a "Motion to Correct the Record," in which he claimed that the trial court had made several comments during trial that supported his position but had been omitted from the trial transcript. In November of 2018,

(Continued)

## II.

Appellant's second claim of error concerns the denial of a pretrial motion in which he asked the court to hold a hearing to determine whether he should be appointed a State-funded expert witness. Shortly after being charged, appellant was appointed an attorney by the Office of the Public Defender ("O.P.D."), but he ultimately discharged that attorney for a non-meritorious reason, refused substitute counsel from O.P.D., and decided to represent himself. Following that discharge, appellant filed a pretrial "Motion for Ex Parte Hearing to Establish Necessity for Appointment of Expert Witness," which the State opposed. The court then held a hearing on that motion to determine whether the State was required to provide funding for an expert witness where the defendant, in this case appellant, had refused to be represented by O.P.D. After hearing argument from both parties, the court denied appellant's motion for an ex parte hearing. The court found that, pursuant to the relevant case law, appellant could not "pick and choose which of the State-provided services he wishes to receive" but rather had to "utilize the [O.P.D.'s] complete 'package' of services or forego them entirely."

---

appellant's motion was denied. In September of 2019, the State filed its own "Motion to Correct the Record," claiming that the trial transcript "may be incomplete" with regard to the issues raised in appellant's motion and indicating that the omitted portions "would likely be relevant to Campbell's first question presented." The State then asked that this Court order appellant to correct the record "by ordering the missing portions of the … trial transcript." Appellant thereafter filed a response, arguing that the State's motion should be denied on the grounds that it would be "absurd" for him to be "responsible for providing proof of errors or omissions when his proper motion attempting to do exactly that was categorically denied." From those facts, we see no need to address the State's motion, as the relief requested, namely, ordering appellant to correct the record, has already been denied by this Court and would serve no useful purpose given that appellant has made clear that he no longer wishes to correct the record.

Appellant now contends that the trial court erred in denying his motion. Appellant maintains that "there is no statute or precedent that mandate[ ]s representation by the Office of the Public Defender before the threshold showing of entitlement is made." Appellant also maintains that the court's ruling violated his constitutional rights because it forced him to surrender one's constitutional right, namely, his right to present a defense, in favor of another constitutional right, namely, his right to self-representation.

Appellant is mistaken, as the Court of Appeals rejected a virtually identical argument in *Moore v. State*, 390 Md. 343 (2005). There, the defendant, who was indigent and charged with murder, obtained private counsel to represent him at trial. *Id.* at 347. Prior to trial, the State conducted DNA analysis on evidence found at the scene of the crime. *Id.* Thereafter, the defendant filed a motion requesting "state-funded expert assistance in the field of DNA analysis to prepare his defense." *Id.* The trial court ultimately rejected the request, finding that, despite the defendant's indigency, there were "no Court funds dedicated or available to provide in general for experts in cases where an individual will have private counsel and, specifically, there are not … Court funds available to provide for the expert in this case." *Id.* at 352-53. The court also found that it "would not direct the Office of the Public Defender to provide fees in this case since they are not counsel of record in the case." *Id.* at 353. The defendant was later convicted, and this Court affirmed. *Id.* at 347.

After granting *certiorari,* the Court of Appeals affirmed, rejecting the defendant's claim that he was constitutionally and statutorily entitled to a state-funded expert witness. *Id.* at 357-58, 378. The Court explained that "[t]he General Assembly of Maryland, in

14

setting up the O.P.D., declared that it was establishing that agency with the policy and legislative intent to provide for representation of indigents in criminal and juvenile proceedings, including related necessary services and facilities." *Id.* at 372. The Court noted, however, that "the statutory definition of 'indigent' … is that the defendant is financially unable, without undue hardship, to provide for the *full payment of an attorney* and all other necessary expenses of legal representation." *Id.* at 374 (emphasis in original). The court further noted that the services provided by the O.P.D., which included providing legal representation and funding for expert witnesses, were not severable. *Id.* at 374. The Court held, therefore, "that O.P.D. is not required to pay for expert assistance or other ancillary services if the defendant is not represented by the O.P.D. (or a panel attorney assigned by the O.P.D.)." *Id.* at 374.

Regarding the defendant's constitutional claim, the Court held that the State had not deprived the defendant "of any of his constitutional rights by requiring that he apply to the O.P.D. for representation before he is entitled as an indigent to State funded expert witness services." *Id.* at 374. The Court noted that, "although an indigent criminal defendant enjoys the right to assistance of counsel, this entitlement does not translate into an absolute right to counsel of the defendant's choosing." *Id.* at 377. The Court further noted that, "[i]n the absence of such a right to choice of counsel, there is no constitutional violation when the State requires that an indigent defendant avail himself of the services of the [O.P.D.] in order to obtain [certain services]." *Id.* at 377 (quoting *State v. Miller*, 337 Md. 71, 87-88 (1994)). The Court concluded:

15

> Indigent defendants may utilize the O.P.D.'s complete "package" of services, or forgo them entirely. While such defendants may face difficult choices, the Constitution does not bar the State of Maryland from requiring them to choose between counsel of their choice and ancillary services provided by the O.P.D.
>
> Assuming *arguendo* that the assistance of a DNA expert was necessary to an adequate defense in the instant case, the State did not deny [the defendant] that assistance. Rather, expert assistance was available to him so long as he complied with the procedural requirement that he apply for legal representation through O.P.D. Imposing this requirement on [the defendant] did not violate his constitutional rights.

*Id.* at 378-79.

Here, appellant could have obtained a state-funded expert witness had he accepted representation by O.P.D. Instead, appellant chose to reject that service and represent himself. Pursuant to *Moore,* refusing to provide a state-funded expert witness under those circumstances was consistent with the governing statute and appellant's constitutional rights. Further, assuming *arguendo* that assistance of an expert was necessary to the defense in this case, the State did not deny the Appellant that assistance. Accordingly, the court did not err in denying appellant's motion.

## III.

Appellant's next several contentions concern two videos that he wanted played for the jury. At trial, prior to cross-examining the victim, appellant informed the court that he intended "to play two videos" and that he needed "accommodations to play [the] videos for the jury." The court then had the following exchange with appellant:

> THE COURT: So, you're going to need to tell the State what it is you intend to play so that if they have an objection, I can

16

have a discussion with all of you about that, again, outside of the presence of the jury. So, I don't need to know right now.

[APPELLANT]: Oh, okay.

THE COURT: You're going to write it down, you're going to put the dates, or whatever other identifying information there is about what it is you will be intending to try to put into evidence. And should that be deemed something appropriate, because I don't know what the evidence is, I haven't heard the evidence at all, so I'm learning the facts right along with the jury, because this would be my opportunity to hear the evidence.

So whatever it is, if it's something that's admissible or parts of it are, certainly, the Court has the equipment to be able to play it.

Later, after appellant had begun his cross-examination of the victim, the court, outside of the presence of the jury, asked appellant about the videos. Appellant proffered that the videos each contained an interview with the victim that had been recorded prior to trial. The first video (the "Kids Talk" video) was recorded in July of 2016 and, according to appellant, "completely contradicted everything that she said [at trial]." The second video (the "Care House" video) was recorded in August of 2016 and, according to appellant, was "almost wholly inconsistent with everything she said today." Appellant stated that he wanted to play both videos, in their entirety, to impeach the victim's credibility.

After the State objected on hearsay grounds, appellant argued that the statements were being offered under a hearsay exception, namely, as a prior inconsistent statement. The court then informed appellant that the statements could potentially be admitted if there was something in the recorded interviews that he could "pinpoint" as demonstrating "an issue subject to cross-examination." The court further informed appellant that he could

17

"not simply … turn on a video" but rather he would have to "inquire about these areas" and "give the witness an opportunity to either admit the differing statement or deny it." The court added that it did "have the equipment available if the need arises."

The court then directed appellant to review the transcripts of the two videos during the impending lunch break and to indicate which portions of the videos he wanted to have admitted as impeachment evidence. When the parties returned from the break, the court asked appellant about his review of the transcripts, and appellant responded that "it was just too much to go through in that short amount of time" and that he "didn't get a chance to really go through all of it." After appellant again argued that the videos should be admitted based on "numerous inconsistencies," the court reiterated that, although a recording could be admitted into evidence, "it doesn't just come in on its own" because "impeachment is different than evidence that's substantive to the issues at hand." The court then instructed appellant to "ask [his] questions in cross-examination" and "lay the foundation," at which point the court would "get to that issue of whether or not there is a denial or an admission."

Appellant then resumed his cross-examination of the victim. During that examination, appellant confronted the witness with statements she made during the "Kids Talk" interview that someone other than appellant had raped her and was the father of her child. The victim admitted that she had lied in making those statements.

Due to the protracted nature of appellant's cross-examination, the court ended the proceedings before appellant finished, and the court ordered the victim to return to court the next morning so that appellant could conclude his cross-examination. Before recessing

for the day, the court stated that "the issue of whether or not these video interviews come into evidence still remains one for [the court] to rule on."

When appellant resumed his cross-examination the following day, he again asked the victim about the "Kids Talk" interview, and the victim admitted that everything she said in that interview was untrue and inconsistent with her sworn trial testimony. Appellant then moved to have the "Kids Talk" video admitted into evidence, and a bench conference ensued. Ultimately, the court ruled that the "Kids Talk" video would be admitted as substantive evidence. In so doing, the court declared that, because appellant had already cross-examined the victim about the interview and the victim had admitted that she had lied in the interview, the video did not "need to be played here" but rather the jurors would be given the video and the necessary equipment so that they could review the video during their deliberations. Appellant did not object to the court's ruling. At that point, the following exchange occurred between the court and appellant:

> THE COURT: All right, now, before we go any further, is there anything you're planning to offer as it relates to the interview at Care House, Mr. Campbell, in the same avenue? And understanding, I'm not repeating myself, but if [the Care House interview] is centered around accusing you, then that has nothing to do with what we're talking about now. So I'd like to hear from you if that's where you're planning to go so we can have that part of the discussion now, if that's where you envision moving that in as well.
>
> [APPELLANT]: No, I don't.
>
> THE COURT: Okay. Good. Thank you. And for the record, that's Exhibit No. 4, the CD for the [Care House] interview.

Appellant thereafter concluded the remainder of his cross-examination of the victim. At no point did appellant ask for the "Care House" video to be accepted into evidence or otherwise indicate that he wanted the court to take some additional action regarding either the "Kids Talk" or "Care House" video.

**A.**

Appellant's first appellate contention regarding the videos is that the trial court erred in requiring him to prove the admissibility of both videos before agreeing to provide him with audio/visual equipment to play the videos for the jury. Appellant maintains that the court's actions denied him "the opportunity to participate meaningfully in a judicial proceeding in which his liberty was at stake."

This issue was not preserved for our review. Appellant did not object at any point when discussing the issue of the audio/visual equipment with the court. *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any [non-jurisdictional] issues unless it plainly appears by the record to have been raised in or decided by the trial court[.]").

Assuming *arguendo* that this issue is somehow preserved, appellant's claim is not supported by the record. The court made clear, on multiple occasions, that audio/visual equipment would be made available if appellant needed it. The only "condition" imposed by the court was that, before the videos could be played for the jury, appellant had to disclose the substance of the videos so that, if the State objected, the court could discuss the matter outside the presence of the jury. Thus, the court did not refuse to provide the audio/visual equipment; rather, the court simply refused to permit appellant to play the

videos for the jury without first disclosing the contents of the videos to the State and the court.

**B.**

Appellant's next contention regarding the videos is that the trial court erred in refusing to allow him to play for the jury the "Care House" video in its entirety. Appellant maintains that the court's error deprived him "of his opportunity to present substantive evidence of the complaining witness in a videotaped interview with police making material statements that she later testified under oath were lies."

We hold that appellant's claim was waived. Although appellant, during his cross-examination of the victim, did indicate that he wanted both videos introduced into evidence, the court never actually ruled on the videos' admissibility. Rather, the court repeatedly told appellant that he needed to first confront the witness with the statements before the court would issue a ruling. In fact, when the court recessed for the day in the middle of appellant's cross-examination of the victim, the court expressly stated that "the issue of whether or not these video interviews come into evidence still remains one for [the court] to rule on." Then, when appellant resumed his cross-examination the following day, he confronted the victim with statements from the "Kids Talk" video, and the court ultimately admitted that video as substantive evidence. In so doing, the court asked appellant if there was "anything" he was "planning to offer as it relates to the interview at Care House … in the same avenue" because the court wanted "to have that part of the discussion now" if appellant was "moving that in as well." Appellant responded: "No, I don't."

Thereafter, appellant proceeded with the conclusion of his cross-examination of the victim without asking for the Care House video to be accepted into evidence or otherwise asking the court to make a determination as to the video's admissibility. Thus, appellant's claim that the court erred in not admitting the Care House video was waived. *See Young v. State*, 234 Md. App. 720, 741 (2017) ("[F]ailing to object to a court's decision not to rule on a motion waives the right to appeal that motion."), *aff'd,* 462 Md. 159 (2018); *See also* Md. Rule 8-131(a).

Even if not waived, appellant's claim is unpreserved for our review. Although appellant stated that the Care House Video contained statements by the victim that were generally inconsistent with her trial testimony, appellant provided no insight into the substance of those statements at any point during trial. *In re Adoption/Guardianship Nos. CAA 92-10852, 92-10853 in Circuit Court for Prince George's County*, 103 Md. App. 1, 33 (1994) ("[T]he proponent of evidence that has been excluded must proffer what that evidence would have been."). Absent such a proffer, appellant cannot now claim that the court erred in excluding the video. *See* Md. Rule 5-103(a)(2) ("Error may not be predicated upon a ruling that … excludes evidence unless … the substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered.").

### C.

Finally, appellant contends that the trial court, in admitting the "Kids Talk" video into evidence, erred in giving the jury the option of reviewing the video during deliberations rather than publishing that video during the evidentiary portion of trial.

22

Appellant maintains that the court's error denied him the opportunity to present the video "to the jury for their evaluation of veracity in the course of his defense."

Again, appellant failed to preserve his claim. When the court determined how the Kids Talk video would be presented to the jury, appellant did not object or otherwise indicate that he wanted to have the video played for the jury prior to deliberations. Accordingly, the issue is not preserved for our review. Md. Rule 8-131(a).

**IV.**

Appellant's fourth claim of error concerns allegations of abuse that the victim purportedly made against her stepfather. During his cross-examination of the victim, appellant questioned the victim about a letter she had written to a judge in 2012 while appellant was incarcerated. In that letter, the victim alleged, among other things, that her stepfather had molested her. In response to appellant's questions regarding the letter, the victim testified that, although she had written the letter, appellant had "told [her] what to write" and that "everything in [the] letter is false."

Later, when appellant attempted to have the letter introduced into evidence, the State objected, and the court initially ruled that the letter would be received in evidence. The trial court later clarified that only certain parts of the letter that relate to the victim's credibility would be admitted while "anything that is extrinsic" would be redacted. The court then indicated that the portion of the letter concerning the allegations against the victim's stepfather would be redacted as not being relevant. Appellant did not object, instead stating that the court's actions made "perfect sense." When the court reviewed the redactions prior to appellant testifying, again appellant failed to object.

23

Appellant thereafter took the stand and attempted to testify about the victim's allegations against her stepfather. The State objected, and the court reminded appellant that those allegations had been ruled inadmissible as "not relevant to these proceedings." The court also stated that the allegations contained in the letter were "nothing more than speculation, hearsay."

Appellant now argues that the trial court erred in excluding all evidence of the victim's prior allegations against her stepfather. Appellant maintains that the evidence was admissible as a prior inconsistent statement and that it was relevant to show that the victim was "a shameless liar fabricating false charges against him."

We hold that the court did not err in excluding the victim's statement. For an out-of-court statement to be admissible as a prior inconsistent statement under the hearsay exception outlined in Maryland Rule 5-802.1(a)(2), which is what appellant now argues, the statement must be, at the very least, "inconsistent with the declarant's testimony." *Id.* Here, the victim never testified regarding any abuse at the hands of her stepfather. Thus, her out-of-court statement that her stepfather had abused her was not inconsistent with her testimony.

Even if the statement was somehow inconsistent, the evidence was irrelevant. Whether the victim's stepfather had abused her was of no consequence to the determination of the action, namely, whether appellant had committed sexual abuse and second-degree rape against the victim. *See* Md. Rule 5-401 (defining relevant evidence). To the extent that the victim's purportedly false allegation may have been germane to her credibility, the victim had already admitted that everything in the letter was false and that appellant had

"told [her] what to write." Thus, admitting the statement for the purpose of showing that the victim had lied would have been cumulative. *See* Md. Rule 5-403 ("Although relevant, evidence may be excluded … by considerations of undue delay, waste of time, or needles presentation of cumulative evidence.").

## V.

Appellant's fifth claim of error concerns the trial court's restriction of his cross-examination of the victim. During that cross-examination, appellant asked the victim if she owned or had ever owned "a 7 ½ inch by 2-inch brown latex dildo." The State objected, citing "relevance," and, at the bench conference that ensued, appellant proffered that part of his defense was that "sexual intercourse did not take place" and that the victim had "inseminated herself through masturbation." After the court stated that it would grant appellant "some leeway," the bench conference ended, and appellant's cross-examination of the victim resumed:

> [APPELLANT]: Did you own that dildo?
>
> [VICTIM]: Currently?
>
> [APPELLANT]: Have you ever?
>
> [VICTIM]: Yes.
>
> [APPELLANT]: How did you acquire it?
>
> [VICTIM]: You gave me the money to pay for it.
>
> [APPELLANT]: Do you now or have you ever used it for the purposes of masturbation?
>
> [STATE]: Objection, Your Honor.

THE COURT:  Sustained.

Appellant now contends that the trial court erred in refusing to permit him to cross-examine the victim about her use of a dildo.  Appellant claims that that line of questioning was relevant to his defense, which was based in part on the theory that he had not impregnated the victim through sexual intercourse but rather that she had "unwittingly impregnated herself while masturbating, utilizing a dildo and a used condom with a hole in the tip."

We hold that the trial court did not err in refusing to permit this line of questioning.  To begin with, the trial court did not restrict appellant's entire line of questioning.  The court permitted appellant to ask the victim questions about her ownership of the dildo and how that dildo had been acquired.  The only restriction came when appellant asked the victim: "Do you now or have you ever used [the dildo] for the purposes of masturbation?"  The State objected to that question, and the court sustained that objection.

Based on those facts, we cannot say that the trial court erred in sustaining the State's objection.  Whether the victim had *ever* used the dildo for masturbation did not make it more or less probable that she had, on one occasion several years prior to trial, "unwittingly impregnated herself" while "utilizing a dildo."  *See Smith v. State*, 218 Md. App. 689, 704 (2014) ("Probative value [of evidence] relates to the strength of the connection between the evidence and the issue[.]").  Moreover, even if the evidence was minimally relevant, the trial court did not abuse its discretion in restricting appellant's cross-examination as to whether the victim had ever masturbated using the dildo.  *See Washington v. State*, 191 Md. App. 48, 76 (2010) ("[T]rial courts retain wide latitude … to impose reasonable limits

26

on [] cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.") (citations and quotations omitted).

## VI.

Appellant's final claim of error concerns an instruction given by the court to the jury. Prior to appellant testifying, the court gave appellant the option of testifying from the witness stand or from the lawyer's table. Although appellant initially gave his testimony from the witness stand, he ultimately decided, mid-testimony, to switch to the lawyer's table, where he stayed for the remainder of his testimony.

Later, when the parties' discussed proposed jury instructions with the court, the following colloquy ensued:

> THE COURT: The next one the Court would be giving is Maryland Pattern Instruction 3.0, What Constitutes Evidence. It starts on the first page, it goes halfway down on the second page. State, any objections?
>
> [STATE]: No, Your Honor.
>
> THE COURT: Mr. Campbell?
>
> [APPELLANT]: I, I just haven't read it.
>
> THE COURT: Sure. Take a moment and take a look.
>
> [APPELLANT]: No.
>
> THE COURT: All right.

The parties then continued discussing proposed instructions, and at no time during that discussion did appellant indicate that he had an issue with the court giving the jury

27

Maryland Pattern Instruction 3.0, What Constitutes Evidence. Ultimately, the court gave the following instruction to the jury:

> In making your decision, you must consider the evidence in this case. That is, testimony from the witness stand and physical evidence or exhibits that have been admitted into evidence. In evaluating the evidence, you should consider it in light of your own experiences. You may draw any reasonable conclusion from the evidence that you believe to be justified by common sense and your own experiences. The following things are not evidence, and you should not give them any weight or consideration: any testimony that I struck or that I did not admit into evidence, and questions that the witnesses were not permitted to answer or objections of the parties.

Appellant did not object at the time that instruction was given or at the close of the court's instructions.

Appellant now contends that the trial court erred in providing the above jury instruction to the jury. Appellant maintains that the court's instruction was erroneous because it "tacitly instructed the jury that appellant's testimony was not evidence" given that appellant presented "the bulk of his testimony" from the lawyer's table and not the witness stand. Conceding that he failed to object to the instruction at trial, appellant asks that we review the propriety of the instruction for plain error.

We decline appellant's invitation. Maryland Rule 4-325(e) provides, in relevant part, that an appellate court may "take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." "The appellate courts of this State have often recognized error in the trial judge's instructions, even when there has been no objection, if the error was likely to unduly influence the jury and thereby deprive the defendant of a fair trial." *State v. Brady*, 393 Md. 502, 507 (2006) (citing

*State v. Hutchinson*, 287 Md. 198, 202 (1980)) (quotations omitted). "The premise for such appellate action is that a jury is able to follow the court's instructions when articulated fairly and impartially." *Brady*, 393 Md. at 507 (citations omitted). "It follows, therefore, that when the instructions are lacking in some vital detail or convey some prejudicial or confusing message, however inadvertently, the ability of the jury to discharge its duty of returning a true verdict based on the evidence is impaired." *Id.* (citations omitted).

Nevertheless, in order to recognize error in a court's instructions absent an objection, "the error must be plain, and material to the rights of the accused, and, even then, the exercise of [appellate] discretion to correct it should be limited to those cases in which correction is necessary to serve the ends of fundamental fairness and substantial justice." *Brown v. State*, 14 Md. App. 415, 422 (1972). The Court of Appeals has "characterized the instances when an appellate court should take cognizance of unobjected to error as 'compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial,' and as those 'which vitally affect a defendant's right to a fair and impartial trial[.]'" *Brady*, 393 Md. at 507 (internal citations omitted). On the other hand, plain error review is inappropriate "as a matter of course" or when the error is "purely technical, the product of conscious design or trial tactics or the result of bald inattention." *Id.* (citations and quotations omitted).

Here, the instruction given by the court was identical to the Maryland pattern instruction. *See* MPJI-Cr 3:00. Thus, we cannot say that the court, in giving that instruction, deviated from a legal rule or that, even if it had, such an error was clear or obvious. *See Johnson v. State*, 223 Md. App. 128, 152 (2015) (noting that "it is

well-established that a trial court is strongly encouraged to use the pattern jury instructions."); *See also Yates v. State*, 202 Md. App. 700, 724 (2011) (holding that "the circuit court's use of a pattern jury instruction, without objection, weighs heavily against plain error review of the instructions given."). Moreover, appellant affirmatively waived his objection to the instruction when, during the parties' discussion of proposed jury instructions, he expressly stated that he had no problem with the court giving the pattern instruction as written. Accordingly, under these circumstances, plain error review is inappropriate. *See State v. Rich*, 415 Md. 567, 580 (2010) (addressing the distinction between "forfeited rights" which "are reviewable for plain error," and "waived rights," which ordinarily "are not"); *Carroll v. State*, 202 Md. App. 487, 513 (2011) (noting that "[p]lain error review generally is not applicable" to an "affirmative waiver of [an] issue"), *aff'd*, 428 Md. 679 (2012).

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**